Carla Gowen McClurg, OSB #165144
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
620 SW Main Street, Room 213
Portland, OR 97205
Tel: (503) 326-7659
Email: carla.mcclurg@usdoj.gov

Attorney for Gail Brehm Geiger, Acting United States Trustee for Region 18

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Turning Leaf Homes IV, LLC,<br><br>Debtor. | Case No. 17-30353-tmb11<br><br>**UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF** |

### MOTION

The Acting United States Trustee for Region 18, Gail Brehm Geiger (the "UST"), by and through Trial Attorney Carla Gowen McClurg, hereby moves the Court for an order (i) disqualifying Michael D. O'Brien & Associates P.C. ("O'Brien & Associates") as counsel for the debtor-in-possession, Turning Leaf Homes IV, LLC ("Turning Leaf Homes IV"), (ii) disallowing fees for O'Brien & Associates as of at least August 22, 2017; and (iii) for such other relief as the Court deems appropriate. The UST relies on the documents and pleadings on the Court's docket and the memorandum in support of this motion that follows.

/ / /

/ / /

**Page 1 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

# MEMORADNUM IN SUPPORT OF MOTION

## A. Summary of Argument

The Court should disqualify O'Brien & Associates as counsel for Turning Leaf Homes IV effective as of the date that it was no longer disinterested and/or held an interest adverse to the estate. O'Brien & Associates received a $10,000 retainer from Turning Leaf Management in the bankruptcy case of RenX Group II, LLC, Case No. 17-33139-tmb11 (the "RenX II Case") after Turning Leaf Management received an unauthorized post-petition transfer of $26,000 from Debtor, of which at least $22,000 has still not been returned to the estate. Although O'Brien & Associates disclosed the $10,000 retainer payment in the RenX II Case, O'Brien & Associates did not disclose the retainer payment in Turning Leaf Homes IV's case. The Court should disqualify O'Brien & Associates as counsel effective as of the date it received the $10,000 retainer payment in the RenX II Case, and the Court should disallow all fees O'Brien & Associates incurred after that date.

## A. Summary of Facts

### 1. Baron's Business Enterprise and Involvement in Bankruptcy Cases

Baron is the manager of and holds direct and indirect ownership interests in a number of business entities generally involved in the purchase of various types of residential real estate interests in the greater Portland Metropolitan Area subject to lenders' encumbrances. Baron's total inventory of properties consisted of approximately 80 as of August 2016. The residential properties were previously held in the names of various entities, including RenX Group, LLC; Turning Leaf Homes, LLC; and Turning Leaf Homes III, LLC.

Starting in or about June 2016, after efforts to negotiate with lenders proved unsuccessful, Baron began transferring interests in properties to existing (but generally unused)

**Page 2 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

and newly formed entities for the purpose of filing bankruptcy. Baron is currently involved as the manager and holder of direct and indirect equity interest in four pending bankruptcy cases: *In re Crimson Investment Group, LLC*, Case No. 16-32747-tmb11 (the "Crimson Case"); *In re Turning Leaf Homes IV, LLC*, Case No. 17-30353-tmb11 (the "Turning Leaf IV Case"); *In re Turning Leaf Homes V, LLC*, Case No. 17-31944-tmb11 (the "Turning Leaf V Case"); and the RenX II Case. The Court has entered orders authorizing the employment of O'Brien & Associates as counsel for the debtors-in-possession the Crimson Case, the Turning Leaf IV Case, and the Turning Leaf V Case.

Baron is also the principal of Turning Leaf Management, Inc. ("Turning Leaf Management"). Baron and his wife each own a 50% interest in Turning Leaf Management. Baron testified in the Crimson Case that Turning Leaf Management was formed to manage all of the properties owned by Baron-affiliated entities.

### 2. Baron's Unauthorized Transfers of Bankruptcy Estate Funds to Turning Leaf Management

#### a. The Turning Leaf IV Unauthorized Post-petition Transfers

On February 3, 2017, Baron signed a counter check drawn on an account held in the name of Turning Leaf Management in the amount of $5,000, which was deposited into Turning Leaf IV's bank account number ending 9458 on February 3, 2017.

On February 6, 2017, deeds were signed to convey interests in five residential properties and redemption rights in four properties to Turning Leaf IV. That same day, Turning Leaf IV filed a voluntary chapter 11 bankruptcy petition. On February 7, 2017, the Court entered an order designating Baron as the person to fulfill the duties of the debtor-in-possession for Turning Leaf IV. On February, 20, 2017, Turning Leaf IV filed its Schedules and Statement of Financial

**Page 3 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

Affairs, which Baron signed under penalty of perjury.

On February 22, 2017, a debtor-in-possession account number ending 0160 was opened for Turning Leaf IV. The opening deposit was $464 transferred from Turning Leaf IV account number ending 9458. On February 28, 2017, one deposit of $4,400 was credited to Turning Leaf IV account number ending 9458. The source of the $4,400 deposit is unclear.[1]

On March 7, 2017, Baron testified under oath at the meeting of creditors (the "Turning Leaf IV Meeting") that, among other things, Turning Leaf IV paid $26,000 in consideration for the Turning Leaf IV properties and property rights and that it was a capital contribution. Exhibit 1 is a true and correct copy of excerpts of the pertinent testimony by Baron at the Turning Leaf IV Meeting.

On July 6, 2017, the UST requested that Turning Leaf IV provide various documents and information, including documentation of the purchase of property interests and rights.

Documents Turning Leaf IV produced documents to the UST show that on February 7, 2017, Baron signed a counter check drawn on a Turning Leaf Management account in the amount of $22,000, which was deposited into Turning Leaf IV's account number ending 9458 on February 7, 2017. Baron then signed a counter check drawn on the Turning Leaf IV account number ending 9458 in the amount of $26,000 with the notation "transfer" on February 7, 2017. The $26,000 was deposited into Turning Leaf Management's bank account on February 7, 2017. Baron did not seek Court approval before transferring $26,000 to Turning Leaf Management on February 7, 2017.

---

1 The UST has requested that Turning Leaf IV provide an explanation and documentation regarding the source of the $4,400. The UST has not received documentation regarding the source of the deposit as of the date of this motion. Turning Leaf IV indicates in the Debtor Response to Motion to Dismiss filed on September 8, 2017, ECF No. 91, page 3, that the $4,400 was a hand deposited check or checks from a new tenant.

**Page 4 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Turning Leaf IV did not disclose any transfers outside the ordinary course of business on the February 2017 monthly operating report filed on March 21, 2017 (the "February MOR"). Baron signed the February MOR under penalty of perjury. The post-petition transfer was not recorded or disclosed on the February MOR. In fact, no transactions outside the ordinary course of business, including financial transactions with insiders, were disclosed on the February MOR.

The monthly operating report for March 2017, filed on April 21, 2017 (the "March MOR"), listed for the first time notes payable of $25,500 on form UST-12 (Comparative Balance Sheet); however no loan proceeds were recorded as cash received on form UST-13 (Comparative Cash Flow Statement). The March MOR also listed for the first time real property assets of $24,500. The $24,500 appears to relate to Turning Leaf IV's purported purchase of property interests and rights. No transactions outside the ordinary course of business, including financial transactions with insiders, were disclosed on the March MOR.

It appears that the note payable of $25,500 listed on the March MOR results from Turning Leaf IV's March booking of the deposit of $5,000 on February 3, 2017 and $22,000 on February 7, 2017 as a $27,000 note payable or loan. The $25,500 note payable amount appears to result from crediting the $26,000 payment on February 7, 2017 against the $27,000 note payable balance (leaving a payable balance of $1,000) and recording the $24,500 characterized as real property purchases as a payable. It is not clear to whom the $25,500 payable is owed based on the March MOR or subsequent reports. According to Turning Leaf IV's records, it appears that at least part of a $5,000 pre-petition loan was repaid through the $26,000 payment in addition to a $22,000 post-petition loan.

The UST filed a Motion for An Order Dismissing Case, or, in the Alternative, Converting Case to Chapter 7 in the Turning Leaf IV Case on August 25, 2017 (the "Turning Leaf IV

**Page 5 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

Motion to Dismiss") for various reasons, including the unauthorized post-petition transfer of the $26,000 to Turning Leaf Management.  In the Declaration of Tracey Baron (the "Turning Leaf IV Baron Declaration") attached to the Debtor Response to Motion to Dismiss filed on September 8, 2017 in the Turning Leaf IV Case (the "Turning Leaf IV Response"), Baron declared that Turning Leaf Management "never had the intent to contribute $22,000 to the Estate" and that Baron "did it solely as a recording mechanism for journaled entries."  Turning Leaf IV Baron Declaration ¶5.  Baron further declared that he consented to a return of $4,000 of the $26,000 because Turning Leaf Management never intended to contribute the $22,000. Turning Leaf IV Baron Declaration ¶¶ 4, 5 and 6.  Baron did not explain in the Turning Leaf IV Baron Declaration why he previously testified during the Turning Leaf IV Meeting that $26,000 was paid by Turning Leaf IV for property interests and rights and that it was a capital contribution.

### b.  The Turning Leaf V Unauthorized Post-petition Transfers

On May 23, 2017, Turning Leaf V filed a voluntary chapter 11 bankruptcy petition. Baron was designated as the person to fulfill the duties of the debtor-in-possession in the Turning Leaf V Case pursuant to a court order entered on May 24, 2017.

In the Turning Leaf V Case, Baron was responsible for another unauthorized post-petition transfer.  On June 8, 2017, $15,000 was transferred from the Turning Leaf V pre-petition bank account into the Turning Leaf V debtor-in-possession bank account.  The next day, on June 9, 2017, Baron signed a counter check for $12,000 drawn on Turning Leaf V's debtor-in-possession account, which was deposited into an account held by Turning Leaf Management. Turning Leaf V did not obtain Court authority to transfer the $12,000 to Turning Leaf Management.  Baron also did not appropriately report the post-petition payment of $12,000 on

**Page 6 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

the May/June 2017 monthly operating report for Turning Leaf V. The bank statement for Turning Leaf Management for June 2017 showed a negative balance as of June 30, 2017 of ($944.44).

The UST filed a Motion for An Order Dismissing Case, or, in the Alternative, Converting Case to Chapter 7 in the Turning Leaf V Case on August 25, 2017 (the "Turning Leaf V Motion to Dismiss") for various reasons, including the unauthorized post-petition transfer of the $12,000 to Turning Leaf Management. In the Declaration of Tracey Baron (the "Turning Leaf V Baron Declaration") attached to the Debtor Response to Motion to Dismiss filed on September 8, 2017 in the Turning Leaf V Case (the "Turning Leaf V Response"), Baron declared that he "did the exact same thing as" he did in the Turning Leaf IV Case by "running $12,000 through the account on June 9, 2017 to record the purchase of . . . properties having journaled the funds previously." Turning Leaf V Baron Declaration ¶ 13. Baron indicated that it "was a mistake and [he had] subsequently returned those funds to the Estate as of August 23, 2017." Turning Leaf V Baron Declaration ¶ 13. The bank statement for Turning Leaf V attached to the Baron Declaration shows an online transfer from a checking account ending 5870 to Turning Leaf V on August 23, 2017.[2]

### 3. The RenX Group II, LLC Bankruptcy Case

RenX Group II, LLC ("RenX II") filed its voluntary chapter 11 bankruptcy petition on August 22, 2017 commencing the above-referenced case (the "RenX II Case"). Baron signed the petition as manager for RenX II. ECF No. 1. Baron also signed the schedules, statements, and related documents filed by RenX II on September 5, 2017, ECF No. 16, under penalty of perjury.

---

2 The UST has not been able to confirm the name on the account number ending 5870 despite requesting that information from Turning Leaf IV in connection with inquiries regarding monthly operating reports.

**Page 7 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

According to RenX II's response to item 28 on the Statement of Financial Affairs, Baron owns 90% of RenX II and the remaining 10% interest is split between Todd Ostrum (5%) and Jeff and Lori Watson (5%).

On August 22, 2017, RenX II filed an Application for Employment of Attorneys for Debtor in Possession seeking to employ O'Brien & Associates as its attorney in the RenX II Case (the "RenX II Application"). O'Brien & Associates has disclosed that Turning Leaf Management paid $10,000 to O'Brien & Associates on August 22, 2017 for its retainer in the RenX II Case. In the Rule 2014 Verified Statement for Proposed Professional, O'Brien & Associates disclosed the source of its retainer as Turning Leaf Management and that it is serving as bankruptcy counsel in the Crimson Case, the Turning Leaf IV Case, and the Turning Leaf V Case. Turning Leaf Management also made retainer payments to O'Brien & Associates in the Turning Leaf IV and the Turning Leaf V cases. As of the date of this motion, O'Brien & Associates has not filed supplemental disclosures in the Turning Leaf IV Case or the Turning Leaf V Case regarding its receipt of a retainer payment from Turning Leaf Management.

The UST has inquired regarding the retainer payment in the RenX II Case and whether the funds paid for the retainer in connection with the Ren X II Case impaired the ability of Turning Leaf IV and Turning Leaf V to recover the unauthorized transfers from Turning Leaf Management. The UST has requested bank statements for Turning Leaf Management for July and August 2017 to understand its financial condition following the receipt of the funds from Turning Leaf IV and Turning Leaf V and at the time the retainer payment was made in connection with the RenX II Case. The UST has not received a satisfactory response or documentation in response to this request.

**Page 8 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

## B. <u>Discussion and Legal Analysis</u>

The court has jurisdiction over this contested matter pursuant to 28 U.S.C. § §157 and 1334. Pursuant to 11 U.S.C. § 307, the UST may raise, appear, and be heard on any issue in any case or proceeding under Title 11.

**1. O'Brien & Associates is not disinterested and holds an interest adverse to the Turning Leaf IV Estate.**

Section 327(a) of the Bankruptcy Code requires that, in order to be employed by the bankruptcy estate, professionals "not hold or represent an interest adverse to the estate" and be "disinterested persons." A person is "disinterested" if, in part, the person

> does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14)(C).

In the Ninth Circuit, an "adverse interest" includes:

> the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate.

*In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008); *In re Tevis*, 347 B.R. 679, 688 (9th Cir. BAP 2006).

A person who "serve[s] as an attorney for an entity holding such an adverse interest . . . represents an interest adverse to the estate." *In re Tevis*, 347 B.R. at 688. The "adverse interest" and "disinterestedness" tests overlap, and include "a prohibition on representing conflicting interests." *Id.* at 687; *In re Derek S. Farrington*, Case No. 07-34220-elp7, Memorandum Opinion, page 5 (J. Perris December 11, 2007).

Page 9 - **UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

"If, at any time during the employment, the person represents or holds an interest adverse to the estate with respect to the subject matter of the employment or if such person is not disinterested, the court may deny compensation." *In re Derek S. Farrington*, Case No. 07-34220-elp7, Memorandum Opinion, page 14.

Pursuant to 11 U.S.C. § 328(c), the court may deny allowance of compensation and reimbursement of expenses of a professional person employed under section 327 or 1103 if, at any time during such professional person's employment, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

The statutory requirements of section 327(a) – disinterestedness and not holding or representing an interest adverse to the estate – serve the important policy of ensuring that all professionals appointed under section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities. *In re Tevis,* 347 B.R. at 687. The Bankruptcy Code does not permit a debtor-in-possession to negate a conflict by signing a waiver "because the ultimate party at interest is the creditors of the bankruptcy estate." *In re Perry*, 194 B.R 875, 880 (E.D. Cal. 1996).

O'Brien & Associates accepted a retainer in the RenX II Case from Turning Leaf Management – an entity that had received unauthorized post-petition transfers from two other clients of O'Brien & Associates: Turning Leaf IV and Turning Leaf V. At the time O'Brien & Associates received the retainer from Turning Leaf Management in connection with the RenX II Case, no funds attributable to unauthorized post-petition transfers had been returned to the Turning Leaf IV or Turning Leaf V estates. As of the date of this motion, at least $22,000 in funds transferred post-petition without Court authorization by Turning Leaf IV to Turning Leaf Management have not been returned to the estate.

O'Brien & Associates has a fiduciary obligation to investigate and potentially pursue Turning Leaf Management for the return of at least $22,000. It is also unclear whether the

**Page 10 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

$10,000 received by O'Brien & Associates from Turning Leaf Management is attributable to the unauthorized post-petition transfers by Turning Leaf IV and Turning Leaf V and if its receipt of the $10,000 impacts the ability of Turning Leaf Management to return the $22,000 to the Turning Leaf IV estate.

O'Brien & Associates is therefore not disinterested and holds an interest adverse to the Turning Leaf IV estate as of the date it received the $10,000 retainer from RenX Group II. O'Brien & Associates should therefore be disqualified as counsel in the Turning Leaf IV Case effective August 22, 2017 and all fees incurred after that date should be disallowed.

### 2. O'Brien & Associates failed to disclose its receipt of the RenX II retainer payment in this case.

The Bankruptcy Code and Rules contain several provisions requiring professionals to make disclosures. Rule 2014(a) of the Federal Rules of Bankruptcy Procedure ("FRBP") provides that professionals seeking to be employed in a chapter 11 case must disclose any proposed arrangement for compensation and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the UST, or any person employed by the UST.

Full disclosure in accordance with FRBP 2014(a) is required as an essential prerequisite for both employment under 11 U.S.C. § 327(a) and compensation under 11 U.S.C. § 330. *See West Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005) ("Though [Rule 2014] allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.") *Neben & Starrett, Inc. v. Chartwell Fin. Corp.* (*In re Park-Helena Corp.*)*,* 63 F.3d 877, 882 (9th Cir. 1995) ("Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees."); *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) ("Absent the spontaneous, timely and complete

**Page 11 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

disclosure required by § 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed at their own risk").

Further, the duty to disclose under FRBP 2014(a) is ongoing. *Warner v. Pease* (*In re Bay Voltex Corp.*), 2008 Bankr. LEXIS 4684, *22 (B.A.P. 9th Cir. Oct. 9, 2008) ("Case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises.") (citations and alterations omitted). The disclosure requirements of FRBP 2014(a) are applied strictly. *Park-Helena Corp.*, 63 F.3d at 881-82.

To date, O'Brien & Associates has not filed a supplemental disclosure in the Turning Leaf IV Case or the Turning Leaf V Case concerning its receipt of the retainer from Turning Leaf Management in the RenX II Case. The disclosure requirements of FRBP 2014(a) assist in ensuring that, at all times during the pendency of a chapter 11 case, a professional does not hold or represent an interest adverse to the estate and is disinterested as required by § 327(a). O'Brien & Associates' failure to comply with these requirements in the Turning Leaf IV Case has prevented Turning Leaf IV's creditors from effectively evaluating the degree to which O'Brien & Associates possesses an interest adverse to the estate and lacks disinterestedness in the Turning Leaf IV Case. Moreover, O'Brien & Associates' failure to timely disclose its receipt of the $10,000 retainer from Turning Leaf Management further supports the denial of compensation effective August 22, 2017.

## C. Conclusion

The Bankruptcy Code and Rules require professionals to provide unbiased representation and undivided loyalty to the bankruptcy estate. As of August 22, 2017, O'Brien & Associates was no longer disinterested and held an interest adverse to the estate. The Court should therefore disqualify O'Brien & Associates as counsel for Turning Leaf IV as of that date. Further, the Court should disallow O'Brien & Associates' fees as of August 22, 2017 due to its failure to

**Page 12 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

timely disclose the $10,000 retainer it received from Turning Leaf Management in this case.

DATED this 15th day of September, 2017.

Respectfully submitted,
GAIL BREHM GEIGER
Acting United States Trustee for Region 18


/s/ Carla Gowen McClurg
CARLA GOWEN McCLURG, OSB #165144
Trial Attorney

**Page 13 - UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF**

Case 17-30353-tmb11    Doc 98    Filed 09/15/17

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I served a copy of the foregoing **UNITED STATES TRUSTEE'S MOTION (i) TO DISQUALIFY MICHAEL D. O'BRIEN & ASSOCIATES P.C. AS COUNSEL FOR THE DEBTOR-IN-POSSESSION, (ii) TO DISALLOW FEES, AND (iii) FOR RELATED RELIEF** by mailing a copy of this document, by United States first class mail, postage prepaid, addressed to the following:

Turning Leaf Homes IV, LLC
1701 SE OAK SHORE LN
Portland, OR 97267

GAIL BREHM GEIGER
Acting United States Trustee for Region 18

/s/ Carla Gowen McClurg
CARLA GOWEN McCLURG, OSB #165144
Trial Attorney

# Exhibit 1

```
1                  UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF OREGON
2

3   IN RE:                      :    Case No. 17-30353-tmb

4   TURNING LEAF HOMES IV, LLC, :    Chapter 11

5        Debtor.                :    Portland, Oregon
                                     March 7, 2017
6                               :    10:12 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8             TRANSCRIPT OF 341(a) MEETING OF CREDITORS

9
    APPEARANCES:
10
    For the Debtor:             Michael O'Brien & Associates
11                              BY:  THEODORE J. PITEO, ESQ.
                                12909 SW 68th Pkwy., Suite 160
12                              Portland, OR  97223

13  For the United States       Office of the U. S. Trustee
    Trustee:                    BY:  SONIA ZAHEER, ESQ.
14                              620 SW Main St., Rm. 213
                                Portland, OR  97205
15
    ALSO PRESENT:               TROY SEXTON, ESQ.
16                              (for Ed and Gretchen Penn)

17                              DAVID LAW

18                              RON STENDAHL

19
    TRANSCRIPT PREPARED BY:     JANICE RUSSELL TRANSCRIPTS
20                              1418 Red Fox Circle
                                Severance, CO  80550
21                              757/422-9089
                                trussell31@tdsmail.com
22

23  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
24

25
```

1       P R O C E E D I N G S

2       MS. ZAHEER:  Now is the time set for the meeting of

3   creditors in the chapter 11 bankruptcy case of Turning Leaf

4   Homes IV, LLC, Case No. 17-30353.  Today is March 7, 2017 and

5   the time is 12 past 10:00 a.m.  The case was filed on February

6   6, 2017.

7       My name is Sonia Zaheer.  I'm an attorney with the

8   United States Trustee's Office and the United States Trustee is

9   a component of the U. S. Department of Justice.

10      The examination is being recorded.  Mr. Baron, I will

11  be asking you questions under oath pursuant to Section 341 of

12  the Bankruptcy Code.

13      We have creditors present and they will have the

14  opportunity to ask you questions at the end.

15      MR. BARON:  Uh-huh (indicating an affirmative

16  response).

17      MS. ZAHEER:  The parties present today are myself, Mr.

18  Tracey Baron as the representative for the debtor.  I verified

19  his identity using his Oregon driver's license.  His, debtor's

20  counsel, Mr. Ted Piteo, is present and we have creditors

21  present.  Mr. David Law, Ronald Stendahl, and Troy Sexton are

22  present.

23      Mr. Baron, can you please state your name for the

24  record?

25      MR. BARON: Tracey Stewart Baron.

1  Q    Yes.

2  A    They were going to go back to the bank or, eventually, and

3  they were -- I pretty much looked at them.  They were either

4  going to get lost and be a waste of asset or I could, you know,

5  we could put them somewhere and then, and try to work out the

6  debt.

7  Q    Okay.  What is the current structure of the debtor in terms

8  of who are the members of the LLC and managers?

9  A    I'm the sole member and manager.

10  Q    Do you have any employees?

11  A    No.

12  Q    What is your role as the sole manager and member?  What are

13  the duties that you perform?  I mean, generally, I understand

14  what those type of people, you know, positions do, but I just

15  want to understand what type of work you do.

16  A    I make all the decisions.  I look at what's happening and I

17  communicate with my CPA and my attorney and, and communicate

18  with our contractors and make sure that everything is going

19  smoothly.  Usually, we just handle the problems that come in

20  every day.

21  Q    So can you shed some light on what the business of the

22  debtor is?

23  A    The business of the debtor is we have acquired properties

24  from bankruptcy trustees subject to the existing liens and

25  encumbrances of the previous owner.

1   Q    Are they debtor-in-possession bank accounts?

2   A    They are.

3   Q    And where are these monthly income that you just mentioned,

4   how is that being handled as far as which account is it going

5   into?

6   A    It goes into the, into that DIP account directly from the,

7   the tenant.  And we don't touch it.  It just stays there.

8        MR. PITEO:  And we've provided the DIP account

9   information to Tammy and we can forward it to you if you --

10  would you like copies of it?

11       MS. ZAHEER:  Sure.  That'd be good.

12       MR. PITEO:  We'll get that to you.

13  BY MS. ZAHEER:

14  Q    So generally, the properties that the debtor holds right

15  now, were they transferred into the debtor all at once or did

16  that happen over a period of time?

17  A    No.  A period of two days.

18  Q    And when were these properties that the debtor holds

19  transferred into the debtor?

20       MR. BARON:  What's the date, Ted?

21       MR. PITEO:  I believe it was the 6th of February.  It

22  was the day before the filing.  Or, well, at least most of them

23  were.  I think some of them were a couple of days before that

24  as well.  I'd have to look at the actual --

25       MS. ZAHEER:  His testimony is a period of two days.

```
 1   So we're looking --

 2           MR. PITEO:  Yeah.  That's about right.

 3   BY MS. ZAHEER:

 4   Q    And how was the transfer made?  I mean, were there -- what

 5   kind of paperwork was signed --

 6   A    We did deeds.

 7   Q    -- if any?

 8   A    Deeds from the entity to the, Turning Leaf IV and, that I

 9   signed and then they were recorded through Ted's office.

10   Q    So they were recorded.

11           MR. PITEO:  Yeah.  We utilized WFG Title for that.

12   BY MS. ZAHEER:

13   Q    Did the debtor pay any consideration, any money, or any

14   property?

15   A    Yeah, we did.  I think we paid $26,000 total.

16   Q    Okay.  I'm getting into details when I really just wanted

17   to understand the bigger picture, first.

18       But, Mr. Baron, you testified in the case of Crimson

19   Investment Group, LLC, Case No. 16-32747 -- that was a chapter

20   11 case -- and you testified regarding the other entities that

21   you hold.

22       Do you remember your testimony?

23   A    No, but I can probably answer a question.

24   Q    Well, my -- I wanted to understand if anything has changed

25   since that meeting of creditors when you talked in detail about
```

1  A   No.  It's -- there was more.  I know 3500 came in last

2  night.  So it's probably closer to nine.

3  Q   So the 5,000 that was in there, what was the source of

4  those funds?

5  A   It was my contribution.

6  Q   So when you say your contribution, was it a loan?  Was it

7  money that you personally --

8  A   No.

9  Q   -- gave or --

10  A   I just, it was a capital contribution.

11          MR. PITEO:  And it's quite possible that, that the

12  bank account balance might be a little bit higher or lower than

13  five grand, but it's fairly close.

14          So we'll amend that as soon as I have the bank

15  statement showing me exactly what it was on the date of filing.

16  So you'll get that soon.

17  BY MS. ZAHEER:

18  Q   So when did you deposit the 5,000 in there, your capital

19  contribution?

20  A   When I opened the bank account.

21  Q   Late January is what you said?

22  A   (No audible response.)

23  Q   Okay.  So now I would like to go over each property and

24  we'll start with the Belmont Street.

25  A   Yeah.

1  Q   How did -- so I'll -- I -- what I want to understand about

2  these properties is how originally one of your entities

3  acquired it and later, my understanding is, that later it was

4  transferred to this debtor.  So I, I want those kinds of

5  details.

6      So we'll start with Belmont.  How did you acquire that

7  property or one of your entities?

8  A   It was through a chapter 13 bankruptcy.

9  Q   Do you remember the case name at all?

10 A   No.

11         MR. PITEO:  I -- I can get -- you need all those --

12         MS. ZAHEER:  That will be helpful.

13         MR. PITEO:  -- transfer documents, we will definitely

14 get all those to you.

15         MR. BARON:  We'll have all that stuff.  David

16 Richardson was the, was the attorney.

17 BY MS. ZAHEER:

18 Q   And when did you acquire this property or one of your

19 entities?

20         MR. BARON:  Do we have that here, Ted?

21         MR. PITEO:  I, I don't believe I have any of those

22 documents with me unless -- I -- we just sent all these things

23 over to the IRS, Agent Phil Kushner.  It's possible I still

24 have the e-mail receipt in my box in which case I can give you

25 all that information right now.  Let's see.

1    big investment.

2        So it seemed like a, for a couple thousand dollars to buy

3    it from the bankruptcy trustee, it should make a pretty good

4    risk-reward type of a thing.

5    Q   So was the thousand dollars used to purchase it from the

6    bankruptcy trustee?

7    A    Yeah.  His partner, Darrell Deem, I think, put another

8    thousand into it.  So I think it was like, they put like 2,000

9    total into it.

10   Q   And you know, you've described the condition of the

11   property.  Is there anything you would like to add to the

12   condition, you know, what you've already described?

13   A    No.  It's got close to a hundred thousand dollars of city

14   liens and fines.  It's a problem asset in the city.  The cops

15   call me all the time.  I've spent lots of money keeping it up.

16       So that's why I put this one into the bankruptcy because,

17   one, the sale was coming up and, No. 2, it's like I can't, I

18   mean, it's becoming a nuisance.  It's so bad I got to, we got

19   to see if we can do something with it.

20   Q   So I'm assuming it's not rented at this time, is it?

21   A    Oh, no.

22            MR. PITEO:  And, and I found the deed.  The sale

23   occurred on the 6th of November, 2014, the deed was signed, and

24   then it was recorded November 10th of 2014.  The original

25   grantor was Terry Patton and she conveyed it or he conveyed it

1  to Turning Leaf Homes, LLC.  And the actual consideration was

2  $2,000.

3  BY MS. ZAHEER:

4  Q    And I think you testified earlier it was shortly before a

5  bankruptcy that, this case, that the property was transferred

6  into the debtor, correct?

7  A    Yeah.

8  Q    Do you happen to remember how much was the consideration

9  for this property?

10  A    No.  It's on the deed.

11          MR. PITEO:  Let's see what we have here.  Let's see.

12          MS. ZAHEER:  Well, as long as you can provide that to

13  me later, that should be fine.

14          MR. PITEO:  Okay.  I'm just -- actually we, we do have

15  these deeds with us.

16          MS. ZAHEER:  Okay.

17          MR. PITEO:  So we might be able to give you an answer

18  right away.  Let's see.  Roseburg, Hillsboro Highway, Belmont.

19          MR. BARON:  1500.

20  BY MS. ZAHEER:

21  Q    And are there any liens attached to this property?

22  A    Yes.

23  Q    Okay.  And I'm assuming that the secured creditors are, are

24  listed in Schedule D, is that correct?

25  A    (No audible response.)

1          MR. BARON:  It was just done.

2          MR. PITEO:  -- just done.

3          MR. BARON:  It was just done, Turning Leaf IV.

4          MR. PITEO:  Okay.  So it, it was not --

5          MR. BARON:  The debtor --

6          MR. PITEO:  It was not at the time of filing --

7          MR. BARON:  No.

8          MR. PITEO:  -- but it is now.  I'll just bring it up.

9          MR. BARON:  So, yeah.  Our account balances are maybe

10   over 10, 11,000 now in the, in the account.

11   BY MS. ZAHEER:

12   Q    Did the renter pay a security deposit at all?

13   A    Yeah, I believe so.  I didn't  handle it, so I - I'll have

14   to go look at the, the people that did handle the money.

15          MR. PITEO:  And we'll get you information on that.

16   BY MS. ZAHEER:

17   Q    Would that be your accountant who handles the money?

18   A    Yes.

19   Q    Are there any foreclosures or anything like that in

20   relation to this property?

21   A    It's in its redemption period right now.

22   Q    Oh, okay.  When was it sold?

23   A    December.

24   Q    So what is your plan for, I mean, you have a one-year lease

25   in there.  What is your plan?  How do you -- I'll let you

```
 1                    EXAMINATION

 2  BY MR. SEXTON:

 3  Q   Mr. Baron, my name is Troy Sexton.  I represent Ed and

 4  Gretchen Penn.  Do you know who they are?

 5  A   I do.

 6  Q   Good.

 7      So as I've been listening to the testimony here in your 341

 8  examination, it's my understanding that all of the properties

 9  that the debtor currently holds were transferred to the debtor

10  within a few days of its bankruptcy filing, is that correct?

11  A   Yes.

12  Q   And that all of these properties were originally held by

13  other entities that you control?

14  A   That's correct.

15  Q   And I understand that you testified that those entities

16  were Turning Leaf Homes III, Turning Leaf Homes, and RenX?

17  A   Yes.

18  Q   Okay.  And that the debtor paid a cumulative sum of $26,000

19  for all of these properties, is that accurate?

20  A   Pretty -- yes.

21          MR. PITEO:  I think what -- what -- and if there is

22  any kind of -- we're going to go check.  It sounded like he was

23  estimating there.  So we'll make sure we get you an exact

24  figure.

25          MR. SEXTON:  Sure.
```

1       MR. BARON:  It's in that ballpark.

2   BY MR. SEXTON:

3   Q    Give or take 26,000?

4   A    Yes.

5   Q    And how was that $26,000 number determined?

6   A    Basically, on the history that I have had with the

7   properties.  I buy them from the trustees and how close they

8   are to sale and -- 'cause a lot of the properties were going to

9   sale in a couple of days.  Some of them weren't.

10      So I put a greater value on the ones that -- based on my

11  history and what the -- and I put the value that -- the person

12  who bought the Scholls Ferry property at auction offered me

13  10,000.  So there was a market there for that and that's where

14  I put -- that's where that value came from.  He offered me

15  $10,000 to go away.

16  Q    So you didn't get any appraisals of these properties in

17  advance?

18  A    Oh, no.

19  Q    And of the other entities that -- the -- the transferor

20  entities, Turning Leaf III, Turning Leaf, RenX, is there any

21  other person involved in those entities who took part in the

22  decision about how much to sell these properties for?  Are you

23  on both sides of the transaction?

24  A    I am.

25  Q    Okay.  So you -- is there any other person at, who has --

1   A   It's my company.

2   Q   I understand that.  I'm trying to --

3   A   All my companies.

4   Q   All of them.

5       So you're a sole member of RenX, Turning Leaf --

6   A   Well, my --

7   Q   -- Turning Leaf III?

8   A   My wife and I.

9   Q   Your wife and you.  Okay.

10      And what's your wife's name?

11  A   Michelle.

12  Q   And who is she a member of, or do you --

13  A   Turning Leaf Homes.

14  Q   Is that it?

15  A   RenX, RenX II, Turning Leaf Homes III, Turning Leaf Homes

16  II, and that would be it.

17  Q   It sounds like she's not a member of this debtor entity?

18  A   It seems that way.

19  Q   And it's the only one she's not a member of --

20  A   Yes.

21  Q   -- is that correct?  Okay.

22      And so did she take part in determining any of the values

23  of the properties that were sold to Turning Leaf IV, the debtor

24  here?

25  A   No.

1  Q   Where did this -- what was the source of funds of this

2  $26,000 that was paid to the transferors?

3  A   The management account.

4  Q   Turning Leaf Management Company?

5  A   (No audible response.)

6  Q   So it wasn't actually held by Turning Leaf IV.

7  A   No, no.

8  Q   It was held by the management company?

9  A   No, no.

10         MR. PITEO:  Can I explain that?  Can you rephrase --

11         MR. BARON:  No, I --

12         MR. PITEO:  -- that question?

13         MR. SEXTON:  Sure.

14         MR. BARON:  I made a capital contribution, Troy.

15 BY MR. SEXTON:

16 Q   To, to which entity?

17 A   IV.

18 Q   To IV.  In the amount of 26,000, give or take?

19 A   Yeah.

20 Q   I'm not going to hold you strictly to that number.  I, I

21 understand it's an estimate.  Okay.

22     So you made a capital contribution of 26,000 to Turning

23 Leaf IV and that was how the money was then paid to the other

24 entities for these properties?

25 A   And then paid.

<u>CERTIFICATE</u>

I, court approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.

/s/ *Janice Russell*                    August 14, 2017

Janice Russell, Transcriber                  Date